STATE OF NORTH CAROLINA v. AMOS BALDWIN, JR.

No. 12

(Filed 12 June 1970)

1. **Criminal Law §§ 22, 170— arraignment — defendant's utterance of guilty — harmless effect**

Defendant was not prejudiced by his remark during the arraignment, "No, sir, I have to plead guilty, your Honor," which remark was made in response to the solicitor's request that the court enter a plea of not guilty for defendant, who was standing mute, where (1) the prospective jurors were not questioned as to whether they had heard defendant's remark and were biased thereby, (2) defendant did not challenge the array or exhaust his peremptory challenges, and (3) the trial court entered a plea of not guilty for the defendant.

2. **Jury § 7— challenge to special venire — waiver**

Objection to a special venire is waived by failure to challenge the array.

3. **Jury § 7— objection to individual jurors — waiver**

Defendant may not object to the acceptance of individual jurors when he has failed to exhaust his peremptory challenges.

4. **Criminal Law § 91; Constitutional Law § 31— motion for continuance — additional tests to determine defendant's pathological intoxication**

Motion by defense counsel for a continuance on the ground that there

was a possibility the defendant was suffering from pathological intoxication at the time he allegedly murdered the deceased and that therefore defendant should be administered a brain wave test following his ingestion of alcohol to determine if he was subject to such intoxication, *held* properly denied by the trial court in the exercise of its discretion and with no denial of defendant's constitutional rights, where (1) the motion was made on the opening day of a special term of court ordered for this trial, (2) a special venire of 150 jurors from another county had been summoned on motion of defendant, (3) defense counsel had learned of a psychiatrist's views on pathological intoxication at least one month prior to trial and could have ascertained at that time if defendant had been given a test following alcohol ingestion, and (4) a test result favorable to defendant would not have given him a valid defense to first degree murder in this State.

**5. Criminal Law § 91; Constitutional Law § 31— motion for continuance — discretionary and constitutional grounds**

A motion for continuance is ordinarily addressed to the sound discretion of the trial court, whose ruling thereon is not subject to review absent an abuse of discretion; but where the motion is based on a right guaranteed by the Federal and State Constitutions, the motion presents a question of law and the order of the court is reviewable.

**6. Constitutional Law § 31— due process — time to procure evidence — confrontation**

Due process requires that every defendant be allowed a reasonable time and opportunity to investigate and produce competent evidence, if he can, in defense of the crime with which he stands charged and to confront his accusers with other testimony.

**7. Criminal Law § 6— legal excuses — voluntary drunkenness — crimes of specific intent**

The general rule that voluntary drunkenness is no legal excuse for crime does not obtain with respect to crimes where, in addition to the overt act, it is required that a definite, specific intent be established as an essential feature.

**8. Homicide § 4— first degree murder — specific intent crime**

Murder in the first degree is a specific intent crime in that a specific intent to kill is a necessary ingredient of premeditation and deliberation.

**9. Homicide § 8— defense of intoxication — first degree murder**

The fact that, after his intent to kill was deliberately and premeditately formed when sober, defendant voluntarily drank enough intoxicants to produce pathological intoxication and then executed his murderous intent, *held* not to constitute a valid defense to murder in the first degree in this State.

**10. Criminal Law § 166— the brief — abandonment of assignments**

Assignments of error not discussed in defendant's brief are deemed abandoned. Rules of Practice in the Supreme Court No. 28.

**11. Criminal Law § 163— broadside exception to charge**

An assignment of error based on an exception "to the entire charge of

the court" is broadside and is ineffectual to bring up any part of the charge for review.

**12. Criminal Law § 163— objection to statement of contentions — waiver**

Objections to the statement of contentions must ordinarily be brought to the attention of the court before verdict; otherwise they are deemed to have been waived.

**13. Criminal Law § 163— broadside exception to charge**

An assignment of error that "the charge to the jury was not fair and impartial and was prejudicial to the defendant," *held* broadside and ineffectual.

**14. Criminal Law § 146— mandatory rules of Supreme Court**

The rules of the Supreme Court are mandatory and will be enforced.

**15. Criminal Law § 161— appeal as exception to judgment — irregularity in verdict — review**

Even though defendant in a first-degree murder prosecution did not except to the verdict or to the judgment of life imprisonment based thereon, his appeal was an exception to the judgment and to any other matter of law appearing on the face of the record; consequently, the Supreme Court could consider the irregularity in the verdict and determine that defendant had not been prejudiced thereby.

**16. Criminal Law § 135; Homicide § 31— punishment of life imprisonment — irregularity in verdict**

Although the jury's verdict of "recommendation of mercy" in a first-degree murder prosecution was not in accord with G.S. 14-17, the trial court was correct in treating the verdict as if the jury had recommended that the punishment be imprisonment for life and in imposing a sentence of life imprisonment.

APPEAL by defendant from *Beal, S.J.,* November 1969 Special Session, ORANGE Superior Court.

Criminal prosecution upon a bill of indictment charging that Amos Baldwin, Jr., on 4 June 1969, in Orange County, with force and arms, feloniously, willfully, and of his malice aforethought, did kill and murder Theodore Roosevelt Cole contrary to the form of the statute in such case made and provided and against the peace and dignity of the State.

The State's evidence tends to show that on the morning of 4 June 1969 defendant went to the home of Dorothy Burnett (Dorothy) in Carrboro where Ralph William Baldwin (Ralph) was then living. Defendant and Ralph talked for about two hours. They went to the "7-Eleven" and bought a quart of beer. Returning to Dorothy's house, they drank beer and played records. During this time defend-

ant told Ralph he had seen a policeman named Paul Minor that morning and, thinking he was Policeman Ted Cole, started to shoot him. Defendant had been saying all week that he was going to kill someone. "Amos stated that we were going to read his name in the newspaper." He said he was going to kill Ted Cole because he had given him a speeding ticket. Defendant was sober at that time.

Defendant then took Ralph to the Chapel Hill police station to appear in court, but the case against Ralph was continued. Defendant drove to Marley's Barber Shop on Franklin Street in Chapel Hill where Ralph borrowed $5.00. They were riding in defendant's blue Ford Falcon in which defendant had a fold-up shotgun and a pistol. They rode around drinking beer most of the day. Defendant was driving all right and did not seem to be drunk.

Later in the day they bought gas and defendant inquired at the gas station where Policeman Minor lived. He didn't ask where Ted Cole lived but "Amos knew Ted Cole lived right beside Paul Minor." Leaving the service station, defendant drove down a dirt road and asked a little boy where Ted Cole lived. He then drove to Cole's house and stopped the car. Cole was standing in his yard. Defendant asked Cole "why he told lies on him — them damn lies on him." Defendant then jumped out of his car "with his shotgun in his hand and Cole was standing up in the yard. Amos shot him — shot him right quick. After Amos shot him, he fell and then Amos shot him again after he fell to the ground." Defendant then got in his car, "took off fast" and drove to his home. On arrival there, Ralph jumped out of the car, caught a ride to the police station and reported that defendant had shot a policeman. Shortly thereafter, defendant was arrested and charged with first degree murder.

Defendant, testifying in his own behalf, stated that he had been drinking continuously for about a week and had "no recollection of anything that transpired on Tuesday, June 3, or Wednesday, June 4, 1969, and I have no recollection of Ted Cole's death." His wife testified that he was under the influence of liquor on June 4 and "did not seem right."

· The case was submitted to the jury and it returned a verdict of "guilty of first degree with mercy." The court then asked, "You have reached a verdict of murder in the first degree with recommendation of mercy?" The foreman replied, "Yes sir." The jury was polled at defendant's request and each juror stated that his verdict was "guilty of murder in the first degree with recommendation of mercy." The court thereupon pronounced a sentence of life imprisonment. Defend-

ant gave notice of appeal to the Supreme Court assigning errors as noted in the opinion.

*C. B. Hodson and Robert L. Satterfield, Attorneys for defendant appellant.*

*Robert Morgan, Attorney General, and Burley B. Mitchell, Jr., Staff Attorney, for the State.*

HUSKINS, J.

**[1]**   On motion of defendant a special venire of 150 persons had been summoned from Person County and was present in court when defendant was arraigned. Upon arraignment the solicitor read the bill of indictment and addressed the prisoner as follows: "How say you, Amos Baldwin, Jr., are you guilty of the felony of murder wherein you stand indicted or not guilty?" The solicitor then addressed the court and said, "The defendant stands mute; if your Honor please, I would like the court to enter a plea of not guilty for him." The defendant, speaking for himself, answered, "No sir, 1 have to plead guilty, your Honor." Defense counsel thereupon said, "Motion." The motion was denied, and the court entered a plea of not guilty for the defendant. Defendant assigns as error the denial of his motion.

**[1-3]**   As shown by the record, no grounds for the "motion" were stated. In a conference at the bench defense counsel advised the court "that the entire jury panel had heard the defendant and that motion as for nonsuit should be allowed." In his brief counsel refers to "defendant's motion for a mistrial made during the arraignment." It is obvious that defendant's motion — by whatever name it may be called — was not in order at that point. No plea had been entered, no jury had been impaneled, and no evidence had been offered. Furthermore, defendant's position is not strengthened by treating — as we do — the motion as one for continuance on the ground that defendant's remarks had prejudiced his case with the prospective jurors then present in court so that he could not obtain a fair trial. This is true because no prejudice is shown. There was no challenge to the array before plea as there might have been. *State v. Rorie,* 258 N.C. 162, 128 S.E. 2d 229; *State v. Corl,* 250 N.C. 258, 108 S.E. 2d 615. The jurors were not questioned as to whether they heard defendant's unsolicited, spontaneous utterance and were biased as a result. None were challenged for cause or peremptorily on that ground. If defendant exhausted his peremptory challenges, the record fails to show it. Objection to the special venire was waived by failure to challenge

the array (*State v. Kirksey*, 227 N.C. 445, 42 S.E. 2d 613); and defendant may not object to the acceptance of individual jurors when he has failed to exhaust his peremptory challenges. *State v. Anderson*, 228 N.C. 720, 47 S.E. 2d 1; *State v. McKethan*, 269 N.C. 81, 152 S.E. 2d 341. How, then, can it be determined if the jurors who served in this case heard the defendant's statement and, if so, were prejudiced thereby? The record fails to show that any juror was accepted to which defendant had legal objections upon any ground. The judge in his discretion overruled the motion and entered a plea of not guilty. His action in that respect effectively removed the slightest suggestion of prejudice which might otherwise be attributed to the occurrence. We see no merit in this assignment, and it is over-ruled.

[4]    Defendant's second assignment is based on the denial of his motion for continuance on the grounds of newly discovered evidence. Examination of the record is necessary to bring this assignment into focus.

On 18 June 1969, Charles B. Hodson, defendant's court-appointed counsel, filed affidavit and motion that, in his opinion, defendant did not know right from wrong and did not have sufficient mental capacity to undertake his defense. Counsel therefore moved that defendant be committed forthwith to the State Hospital at Goldsboro, North Carolina, for a period of sixty days for observation in accordance with the provisions of G.S. 122-91. The motion was allowed. At the end of the observation period, the superintendent of the hospital was directed to report his findings and recommendations to the Clerk of the Superior Court of Orange County as provided by law.

In obedience to said order, defendant was admitted, examined and observed for sixty days; and on 20 August 1969 a Clinical Summary containing findings and recommendations was submitted to the Clerk of the Superior Court of Orange County signed by E. C. Fowler, M.D., Clinical Director, and Bruce Kyles, M.D., F.A.P.A., Assistant Superintendent. Copies were furnished for the solicitor and defense counsel. This summary shows defendant has an IQ of 84 (indicating dull, normal intelligence) and contains the following pertinent information:

> "Family history said to be negative for nervous or mental disorder. . . . He denies DT's or other disturbances. . . . Hallucinations of any kind at any time were denied and none were apparent. . . . The content of thought showed no evidence of a thinking disorder, delusional material or any other

abnormality. . . . Because of the complaint of blackout following drinking an electroencephalogram (EEG, brain wave test) was done. This was reported as normal and there is no indicated basis found for 'blackouts when drinking' other than the amount of liquor that would be taken. Skull x-ray was normal. . . . Subject stated that he had never had a nervous disorder and was not a regular drinker but did over drink when he would get upset. . . . and stated that there was nothing wrong with his mind but 'I was just out that day.' He states he had been upset as he stated he had found out his wife had been out all night and . . . that perhaps Mr. Cole, the victim, had been at the same party which was in that neighborhood. Careful examination failed to elicit any significant disorder and subject understood his charge and his situation quite clearly.

DIAGNOSIS: WITHOUT MENTAL DISORDER.

DISPOSITION:  1.  Return to court as able to stand trial.

2.  It is the carefully considered opinion of the medical staff of this hospital that Amos Baldwin, Jr. is able to plead to the bill of indictment against him. He knows right from wrong, is aware of the nature and probable consequences of the offense with which he is charged, and, in our opinion, is able to consult with counsel in the preparation of his defense."

Following arraignment and in the absence of all prospective jurors, defense counsel moved for continuance on the ground of newly discovered evidence which had come to his attention on Sunday afternoon (the day before the arraignment). Counsel stated that he had been supplied "some information regarding alcoholic pathological intoxication, which I understand, is a form of insanity which occurs with automatic behavior and frequently results in violence. . . ." Counsel stated that he had previously caused Dr. Silas B. Coley, a psychiatrist with the Pathological Service Center of Hillsborough, North Carolina, to make a personal examination of the defendant "and had him examine the report from Goldsboro." Dr. Coley, an expert in the field of psychiatry, then testified under oath that, based on his interview with defendant and on information supplied by defense counsel, he had come to the conclusion "that there was a possibility that at the time the crime of murder was alleged to have taken place, that the prisoner Amos Baldwin, Jr. was suffering from a state that is known as pathological intoxication." Dr.

Coley stated that such condition was difficult to prove without some documentation and that proof would be provided by an abnormal reading in an EEG (electroencephalogram) following the ingestion of alcohol; that a person 'suffering from pathological intoxication would be capable of complicated behavior including violent behavior and, based on the description of defendant's personality state and mental state at the time the crime was committed, "it bears a strong resemblance to the condition of alcoholic pathological." Dr. Coley went on to state that from what he had seen of defendant "it sounded like an abrupt change in personality" and that he felt the psychiatric investigation made during the period defendant was under observation at Cherry Hospital in Goldsboro was incomplete in that it lacked the test of administering alcohol prior to the EEG which, if done, would reveal whether or not defendant was subject to pathological intoxication. Dr. Coley recommended that defendant be given an EEG following a test dose of alcohol — a neurological procedure that he was not in a position to perform. He stated that the professional fee for this procedure would be approximately $500.00.

Defense counsel thereupon requested a continuance in order to carry out such an examination at public expense. The court in its discretion denied the motion, and this constitutes defendant's second assignment of error.

The record shows counsel had received a letter from Dr. Coley dated October 2, 1969, containing the doctor's conclusion that defendant possibly could have been suffering from pathological intoxication when the murder was committed and further shows that on Sunday afternoon at approximately one o'clock counsel received a telephone call "which brought forth new evidence in this matter." The content of the telephone call is not revealed. The only *newly discovered evidence* mentioned is information that defendant had not ingested a test dose of alcohol prior to being given the brain wave test at Cherry Hospital. The record is unclear as to when counsel received this information. Apparently that constitutes the newly discovered evidence relied on as the basis for a continuance.

**[5]** A motion for continuance is ordinarily addressed to the sound discretion of the trial court, and its ruling thereon is not subject to review absent an abuse of discretion. 2 Strong's N. C. Index 2d, Criminal Law § 91; *State v. Moses,* 272 N.C. 509, 158 S.E. 2d 617; *State v. Stinson,* 267 N.C. 661, 148 S.E. 2d 593; *State v. Ferebee,* 266 N.C. 606, 146 S.E. 2d 666; *State v. Arnold,* 258 N.C. 563, 129 S.E. 2d 229; *State v. Stroud,* 254 N.C. 765, 119 S.E. 2d 907; *Cleeland*

*v. Cleeland,* 249 N.C. 16, 105 S.E. 2d 114. If, however, the motion is based on a right guaranteed by the Federal and State Constitutions, the motion presents a question of law and the order of the court is reviewable. *State v. Phillip,* 261 N.C. 263, 134 S.E. 2d 386; *State v. Lane,* 258 N.C. 349, 128 S.E. 2d 389; *State v. Hackney,* 240 N.C. 230, 81 S.E. 2d 778; *State v. Gibson,* 229 N.C. 497, 50 S.E. 2d 520. Defendant urges both abuse of discretion and denial of constitutional rights as error.

**[4]** This continuance was sought on the opening day of a special term of court which had been ordered specifically for the trial of this case. On defendant's motion, a special venire of 150 jurors summoned from another county was present in court to insure him a fair trial by an impartial jury. Defendant and his counsel had known Dr. Coley's views on the subject of pathological intoxication since October 2, 1969. A copy of the Clinical Summary containing the findings and recommendations of Drs. Fowler and Kyles, based on a sixty-day observation of defendant at the State Hospital at Goldsboro, had been in their possession since approximately 20 August 1969. If they desired a further examination of defendant for the purpose of making a brain wave test (EEG) after ingestion of alcohol, diligence required them to bring such desire to the court's attention before the term was set and the veniremen summoned. The judge was fully justified in his discretionary denial of a last-minute motion for continuance when it could and should have been made before extensive preparation for trial had been completed. No abuse of discretion has been shown.

**[6]** Due process requires that every defendant be allowed a reasonable time and opportunity to investigate and produce competent evidence, if he can, in defense of the crime with which he stands charged and to confront his accusers with other testimony. *State v. Utley,* 223 N.C. 39, 25 S.E. 2d 195; *State v. Farrell,* 223 N.C. 321, 26 S.E. 2d 322; *State v. Whitfield,* 206 N.C. 696, 175 S.E. 93; *Powell v. Alabama,* 287 U.S. 45, 77 L. ed 158, 53 S. Ct. 55; 2 Strong's N. C. Index 2d, Constitutional Law § 29; 14th Amendment, U. S. Constitution; Art. I, §§ 11 and 17, N. C. Constitution.

Pathological intoxication has been described as follows:

> "In this syndrome the patient is apparently susceptible to extremely small amounts of alcohol and reacts to such amounts violently. He consumes a small amount of alcohol, perhaps 2 or 3 drinks, and develops total amnesia for the events that follow. He often carries out automatic behavior and sometimes this behavior is violent and dangerous to others. From this standpoint

the illness is of considerable importance as a medico-legal problem. While patients suffering from alcoholism are responsible for their acts, a patient with acute pathological intoxication is insane at the time and therefore not responsible for his acts.

"A peculiar and interesting relationship between pathological intoxication, psychopathic personality, and psychomotor epilepsy has been found by this writer, and the evidence, particularly electroencephalographic, points to the fact that the disorders are essentially identical. This interesting association of some cases of psychopathic personality with psychomotor epilepsy and pathological alcoholic intoxication indicates that pathological alcoholic intoxication and psychomotor epilepsy may be the same disease under two different names. In one case (psychomotor epilepsy), psychomotor epileptic attacks simply occur spontaneously; in the other (pathological intoxication), psychomotor attacks occur under the stimulus of alcohol." Thompson, Alcoholism, p. 467 (1956)

Several states have adopted a so-called theory of diminished responsibility with respect to *specific intent* crimes and hold that defendant may offer evidence of an abnormal mental condition, although not sufficient to establish legal insanity, for the purpose of showing that he did not have the capacity to deliberate or premeditate at the time the homicide was committed — elements necessary for a conviction of murder in the first degree. *People v. Gorshen,* 51 Cal. 2d 716, 336 P. 2d 492 (1959); *Becksted v. People,* 133 Colo. 72, 292 P. 2d 189 (1956); *State v. Gramenz,* 256 Iowa 134, 126 N.W. 2d 285 (1964); *State v. Vigliano,* 43 N.J. 44, 202 A. 2d 657 (1964). But California is apparently the only state which thus far recognizes pathological intoxication as a defense to first degree murder. *People v. Castillo,* 70 A.C. 274, 74 Cal. Rptr. 385, 449 P. 2d 449 (1969); *People v. Conley,* 64 Cal. 2d 310, 49 Cal. Rptr. 815, 411 P. 2d 911. The problem was discussed in *Kane v. United States,* 399 F. 2d 730 (9th Cir. 1968), cert. den., 393 U.S. 1057, 21 L. ed 2d 699, 89 S. Ct. 698 (1969). The Court held that the disability which prevented Kane from knowing the nature and quality of his action at the time he shot his wife was acquired from drinking liquor — an act within his own control — and could not be classified as a mental illness excusing criminal responsibility.

**[7, 8]** The general rule that voluntary drunkenness is no legal excuse for crime (*State v. Potts,* 100 N.C. 457, 6 S.E. 657; *State v. Wilson,* 104 N.C. 868, 10 S.E. 315) does not obtain with respect to crimes where, in addition to the overt act, it is required that a

definite, specific intent be established as an essential feature, *State v. Murphy*, 157 N.C. 614, 72 S.E. 1075. Murder in the first degree is a *specific intent* crime in that a specific intent to kill is a necessary ingredient of premeditation and deliberation. Intoxication which renders an offender utterly unable to form the required intent may be shown as a defense. *State v. Propst*, 274 N.C. 62, 161 S.E. 2d 560 (murder in the first degree); *State v. Arnold*, 264 N.C. 348, 141 S.E. 2d 473 (attempting to burn a dwelling house); *State v. Oakes*, 249 N.C. 282, 106 S.E. 2d 206 (murder in the first degree); *State v. Bunton*, 247 N.C. 510, 101 S.E. 2d 454 (murder in the first degree); *State v. Absher*, 226 N.C. 656, 40 S.E. 2d 26 (murder in the first degree). Even so, where the facts show that the intent to kill was deliberately formed when sober and executed when drunk, intoxication is no defense to the capital charge. *State v. Kale*, 124 N.C. 816, 32 S.E. 892; *State v. Murphy, supra.*

"All the authorities agree that to make such defense available the evidence must show that *at the time of the killing* the prisoner's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill. . . . [A]nd where the evidence shows that the purpose to kill was deliberately and premeditatedly formed when sober, the imbibing of intoxicants to whatever extent in order to carry out the design will not avail as a defense." *State v. Shelton*, 164 N.C. 513, 79 S.E. 883; *accord, State v. English*, 164 N.C. 497, 80 S.E. 72; *State v. Foster*, 172 N.C. 960, 90 S.E. 785. See Annotation, "Modern Status of the Rules as to Voluntary Intoxication as Defense to Criminal Charge," 8 A.L.R. 3d 1236, for a collection of cases in other jurisdictions relating to intoxication as a defense.

[4, 9]     Had the opinion of Dr. Coley been substantiated by a brain wave test following ingestion of alcohol by defendant, it would not have established an insanity defense in the usual sense nor a defense that defendant was so drunk that he was *utterly unable* to form the required specific intent to kill. It would have established only that, after the intent to kill was deliberately and premeditatedly formed when sober, defendant voluntarily drank enough intoxicants to produce pathological intoxication and then executed his murderous intent. This is not recognized in North Carolina as a valid defense to murder in the first degree. Hence denial of the motion for continuance nowise impinged upon defendant's constitutional rights. Due process does not include the right to fish in psychiatric ponds for immaterial evidence.

For decisions in other jurisdictions relating to abnormal mental

conditions and purposes for which evidence thereof may be considered, see Annotation, "Comment Note. — Mental or Emotional Condition as Diminishing Responsibility for Crime," 22 A.L.R. 3d 1228. Defendant's second assignment of error is overruled.

[10]    Assignments of Error Nos. 3, 4 and 5 are not discussed in defendant's brief and are therefore deemed abandoned under Rule 28, Rules of Practice in the Supreme Court. *State v. Strickland,* 254 N.C. 658, 119 S.E. 2d 781; *State v. Cole,* 270 N.C. 382, 154 S.E. 2d 506; *State v. Kirby,* 276 N.C. 123, 171 S.E. 2d 416.

Defendant's Assignment No. 6 is based on Exception No. 6 which appears on page 75 of the Record in these words: "The defendant excepts to the entire charge of the court." The charge covers thirty-nine pages. In his brief, defendant asserts that "the Court erred in its entire charge to the jury in that he gave more weight, stress and credibility to the evidence of the State than to that of the defendant."

[12]    This is a broadside assignment which is ineffectual to bring up any part of the charge for review by this Court. *State v. Kirby, supra; Lewis v. Parker,* 268 N.C. 436, 150 S.E. 2d 729; *State v. Wilson,* 263 N.C. 533, 139 S.E. 2d 736. Objections to the statement of contentions must ordinarily be brought to the attention of the court before verdict — otherwise they are deemed to have been waived. *Doss v. Sewell,* 257 N.C. 404, 125 S.E. 2d 899; *Peek v. Trust Co.,* 242 N.C. 1, 86 S.E. 2d 745; 1 Strong's N. C. Index 2d, Appeal and Error § 31.

[13]    Defendant next contends the court erred in that the "charge to the jury was not fair and impartial and was prejudicial to the defendant." This is designated as Assignment No. 7.

This assignment is likewise broadside and ineffectual. "Assignments of error to the charge should quote the portion of the charge to which appellant objects, and assignments based on failure to charge should set out appellant's contention as to what the court should have charged." *State v. Kirby, supra; State v. Wilson, supra; Samuel v. Evans and Cooper v. Evans,* 264 N.C. 393, 141 S.E. 2d 627.

[14]    The requirements of the rules and the reasons for them have been reiterated throughout our Reports. These rules are mandatory and will be enforced. *State v. Kirby, supra; Walter Corp. v. Gilliam,* 260 N.C. 211, 132 S.E. 2d 313; *Pamlico County v. Davis,* 249 N.C. 648, 107 S.E. 2d 306; *Hunt v. Davis,* 248 N.C. 69, 102 S.E. 2d 405; *Pruitt v. Wood,* 199 N.C. 788, 156 S.E. 126.

[15]    Defendant does not except to the verdict or to the judgment

of life imprisonment based thereon. Even so, the appeal itself is an exception to the judgment and to any other matter of law appearing upon the face of the record. *Balint v. Grayson,* 256 N.C. 490, 124 S.E. 2d 364; *Dilday v. Board of Education,* 267 N.C. 438, 148 S.E. 2d 513; *Cratch v. Taylor,* 256 N.C. 462, 124 S.E. 2d 124. *The record,* in the sense here used, refers only to the essential parts of the record, such as the pleadings, verdict and judgment. "It refers only to such constituted matters of the action as must necessarily go upon and constitute the record of it, and which the Court sees and must take notice of, such as the pleadings, the verdict, and the judgment; it does not refer to such matters and things as are of, but incident to the action and do not necessarily go upon the record, such as the rulings of the Court upon questions arising upon motions, evidence, its instructions to the jury, and the like. Such matters as those last mentioned, do not go upon and become part of the record, unless the correctness of the decisions of the court, upon them is questioned, in which case, they are made part of the record, to the end, the complaining party may enter his objections, and the grounds thereof, and assign error. Such decisions of the court are presumed to be correct and acceptable to the parties, in the absence of objections so made." *Thornton v. Brady,* 100 N.C. 38, 5 S.E. 910; *State v. Stokes,* 274 N.C. 409, 163 S.E. 2d 770; *Lewis v. Parker,* 268 N.C. 436, 150 S.E. 2d 729; *In re Will of Adams,* 268 N.C. 565, 151 S.E. 2d 59; *Lowie and Co. v. Atkins,* 245 N.C. 98, 95 S.E. 2d 271.

[16]    While defendant does not assign the form of the verdict as error, we call attention to the fact that the jury's "recommendation of mercy" is not in accord with G.S. 14-17. "The punishment specified in G.S. 14-17 for first degree murder is either death or imprisonment for life." *State v. Benton,* 276 N.C. 641, 174 S.E. 2d 793. Even so, the court treated the verdict as if the jury had recommended that "the punishment be imprisonment for life in the State's prison" and imposed a sentence of life imprisonment. Hence the irregularity in the verdict has not prejudiced defendant and the judgment will not be disturbed. *State v. Locklear,* 253 N.C. 813, 117 S.E. 2d 763; *State v. Bailey,* 254 N.C. 380, 119 S.E. 2d 165; *State v. Foye,* 254 N.C. 704, 710, 120 S.E. 2d 169, 173.

Since prejudicial error has not been shown and error of law does not appear upon the face of the record proper, the verdict and judgment will be upheld.

No error.